for the Fourth Circuit. Oyez, oyez, oyez. All persons who have any manner of form of business before the Honorable United States Court of Appeals for the Fourth Circuit must withdraw an act and give their abstention, for the Court is now sitting. God save the United States and its Honorable Court. Good morning. We are happy to hear arguments in North Carolina State Conference of the NAACP v. McCrory. Ladies and gentlemen, we know you have prepared a lot of things to say and there are a lot of issues here, and so if you can try to organize yourself so that you get to your most important issues in the time allotted, we really appreciate it. Thank you. With that in mind, Ms. Baldwin? Good morning. Anna Baldwin representing the United States. To the order of the presentation this morning, I'm going to be addressing the United States Section 2 claim under both its intent and results prong. Ms. Hare is also going to be addressing the Section 2 claim, focusing on the results prong, and Ms. Riggs is going to be addressing the plaintiff's constitutional claims and also addressing any questions about implementation. Ma'am, your brief reads like a closing argument, which I might find persuasive if I were to try it with that, but that's not the case here. If the inference is drawn by the district court plausible, aren't they due argued efforts? To me, that's the core of the case. Certainly, Your Honor. And under the Pullman-Swent standard, if the district court applied the wrong legal standard, the facts found by the district court aren't binding. And so to start with the intent analysis, there are critical errors in the legal analysis in the district court's analysis of the United States intent claim that frame the analysis. We have to start with the fact that in passing HB 589, the North Carolina legislature acted to block growing African-American political power just as black North Carolinians had begun to experience real political gains. In looking at this claim, the district court failed to take account of the fact that even as the defendants' experts testified, in North Carolina, the best predictor of voting behavior is not party registration but race. And so a proper intent analysis would have required the district court to expressly consider whether passage of HB 589 was motivated in part by what the Supreme Court in LULAC called the troubling blend of race and politics. The district court committed legal error in failing to analyze plaintiff's intent claim through the framework that the Supreme Court set out in LULAC v. Perry. When you speak to the intent claim, are you referring to the Section 2, potential discrimination or the 14th Amendment intentional discrimination? I mean, is there a difference? Under the 14th Amendment intentional discrimination and the Section 2 intentional discrimination, it's the same standard. And the United States is pressing its claim under the guise of Section 2, but the standard is the same. The question is, was the legislative action motivated in part by a racially discriminatory purpose? So in any event, you are presenting a constitutional argument here, and yet there's a Section 2 results argument. Should we reach that one first? Your Honor, we think that understanding the Section 2 results claim in this case, it's helpful in the tenuousness factor in particular to look at the intent claim. And the parties would ask the court to reach both the results and intent violation because of the nature of the relief we're seeking, where we're seeking relief under Section 3C of the Voting Rights Act, which requires the finding of intent. And your colleague, who's going to argue last, is going to explain that all to us, right? She's going to be addressing the Anderson verdict constitutional claim. But in terms of the intent claim, the racially discriminatory intent claim is necessary under the Voting Rights Act to retrigger a preclearance and coverage requirement under Section 3C. And so that's why that finding needs to be made under the intent claim. So looking at the legal error in the intent... We understand you want everything, but I think my colleague's question to you was, in your first brief, you did the intent claim first. In your second brief, you did your intent claim second. So which is first in your heart? Your Honor, we think that both are very strong claims. And with respect to both, we're not... But really, what the question is going to is that typically we don't deal with a constitutional issue if we can resolve it on another ground. So I think... The question is here, Congress having Section 2, should we first address that? And if we reach a resolution there, of course, you would like for us to go for your remedial reasons to the constitutional question, but shouldn't we start at least there? Well, I think, you know, in terms of what's very practically important, the court, the parties, were all aware of the fact that there is an election upcoming in November. And so the importance of having some kind of remedy in place and having a reversal and an injunction and joining the provisions that are discriminatory, that can cleanly be done under the results claim that this court could simply correct the legal errors that the district court made and enter relief. And it couldn't be done under the intent claim? Well, the intent claim, too, because there's a legal error in failing to account for, in the intent analysis, racially polarized voting, you know, the seismic growth of the black electorate, the significance of turnout. You know, as my other colleague said, I think we understand all those arguments. Basically, what you've done in your first presentation now is go over your brief with us and you can rest assured. We've read the brief. I'd be a little more interested in the specifics if you can give them to me. For example, did you present at trial any expert data predictions on what the 214 voter turnout would have been without the new statute? No, Your Honor. And, in fact, we explained why that's not possible. Dr. Stewart testified that in order to predict what 2014 turnout would have been, not just doing the simplistic comparison that the district court did to 2010, you need more elections, more states, more data in order to do that. We know what it was under the statute. Did you have any expert try to make a prediction what it would have been if you hadn't had the new statute in place? Well, there's some factual testimony, Your Honor, that you don't even need expert testimony. We know that if the statute hadn't been in place, the more than 1,600 voters who cast out-of-precinct ballots and whose ballots weren't counted, those ballots could have been counted. We know that for the, I believe it's nearly over 12,000 voters who registered after the book-closing period, after the 25-day deadline, but before the election, those voters would have been able to take advantage of same-day registration. But those voters couldn't do that under this statute. So the notion that if we're talking about turnout, the notion that the United States and the plaintiffs didn't prove that this law impacted the number of voters who were able to vote, that's simply not true. There are thousands of voters on the uncontested factual record who were shut out of the political process under this bill. What the district court did in its results analysis, the critical error there is looking to two numbers rather than the numbers I've just cited of voters who were concretely shut out of the process. The district court said, what was turnout in 2010 and what was turnout in 2014? As everybody's experts testified, plaintiffs and defendants alike, you can't measure the impact of an election law just by looking at those two numbers. In 2010, you had a $10 million Senate race. You had a $100 million Senate race in 2014. Of course, that's going to have an impact. And also, in looking at turnout, of course, the statute prohibits laws that have an abridging effect as well as an outright denial. On this record, we've clearly proven outright denial. But it's wrong to set up a standard where you have to show that voters are concretely shut out and don't take extraordinary efforts to overcome that burden, as the record in this case showed that there were extraordinary efforts organized by churches to counteract the effects of this law. I have another factual question. You know, you talk about the 72 new early voting sites. Is there any evidence in the record in terms of whether they were located in black or white communities or Republican or Democratic areas? Well, Your Honor, I think one thing that I'd like to... I'm interested in your explanation, but is there anything in the record about that? I don't believe so. And if I'm wrong, I'll let my colleagues correct me on that. So one thing that I think is important to clarify in our challenge to the early voting changes in HB 589, the United States is not challenging the only portion of the law that defendants have asserted a rationale for, which is, you know, equalizing the locations within counties. We're not challenging that. We are challenging the cutbacks to the number of days of early voting. And that is something for which the defendants have had no rationale. I thought part of your argument, maybe I've misunderstood your argument, was that voting, one of the problems was that the Board of Elections was given this authority to move voting sites around, and they could in that way discriminate against minority voters. Is that not part of your plan? That is not part of our plan. In fact, in the reverse, sort of, the state has relied more on the fact of the location of early voting centers and arguing that they, you know, were used to benefit African-American and Democratic voters. We're not making a claim about the location of the early voting centers. If anything, we think that the state's reliance on that kind of argument is basically an admission of what the facts in this case show, that race and party are really tied together in North Carolina. I don't understand why that isn't part of your race and party argument. That's what I'm asking you about. We're not claiming that the new locations, the old locations discriminated against African-American voters. What we're claiming is the cutbacks to early voting, eliminating seven days, and particularly eliminating the ability of a Sunday, where the record shows that in 2008, 49% of the voters who used that were African-American. In 2012, on that eliminated Sunday, 43%. That's where the disproportionate impact is, is in the cuts of the number of days. We're not challenging the location issues under the bill. So the answer to my original question is, because you believe there was a legal error, we do not have to afford deficits to the district court's emphasis. No, I mean, the case-critical facts before the court aren't contested. As even the district court, I think, towards the closing said, you know, you all could have submitted a lot of this case by stipulation. We agree. It's the inferences that the district court drew from those facts and because of the framework that it had wrongly adopted. In the case of the results claim, it's elevating turnout above every other kind of metric, where, you know, to say that as long as aggregate turnout goes up, as long as more black voters voted in 2014 than voted in 2010, you can't have a discriminatory burden. And that's simply not the case. With something like same-day registration, we showed what the discriminatory burden is. It's not just disparate use. This isn't just a disparate use statute. It's that African-American voters are more likely to use that. And they're more likely to use that because of reasons connected to a history of discrimination and, importantly, the removal of that disparately burdens and disparately amplifies the effects of that discrimination because of the literacy deficits. And that's not just speculation. The best evidence of some of that is in the incomplete voter registration queue that you see in 2014, that the voters who are going to have more problems submitting the voter registration applications, failing to, you know, check a box or something, they're disproportionately African-American. And taking away same-day registration where you had an opportunity to correct those errors is going to disparately burden African-Americans. And so that's a way in which, you know, in particular, the burdens that the law imposes are cumulative and greater. You take away a week of early voting. You take away that opportunity for African-American voters to use same-day registration during that period. The more you take away that early voting period where voters can show up to any precinct, the more likely they are to end up in the wrong precinct on election day. What is your best evidence connecting that burden to the historical discrimination? I mean, I think the test that this court set out properly is that, you know, you start with a discriminatory burden. And so we show that through the disparate use. And we also show that through the socioeconomic effects of discrimination that amplify the it's going to be more difficult for voters to navigate the process in North Carolina without those mechanisms. So, you know, I'd give an example of a voter like Gwendolyn Farrington. I think some of the individual voters bring to light the uncontested numerical socioeconomic and disparate use testimony that, you know, she's a voter who works six days a week, 12 hours a day. She had voted early in 2008 and 2012. She didn't have time to vote early during the compressed early voting period in 2014. She voted near her workplace because she worked on election day from 6 a.m. to 6 p.m. And she couldn't have gotten to her correct polling place in the time allotted because she had to pick up her adult children, like 27% of African Americans, three times higher than whites. There are transportation difficulties in her family, where multiple adults rely on one car. You see the, you know, same example of Tara Lynn Cunningham and the ways in which the burdens in this case are cumulative. She was the first time voter who used soles to the polls at a prior election. She works three jobs to make ends meet. On election day, she didn't know where her correct polling place was, and so she voted close to her job. Even if poll workers had told her that she was voting in the incorrect precinct, she wouldn't have had time to get to the correct precinct because she risks, you know, penalties for being just a few minutes late at her work. And the same with Yvonne Washington. Thank you. Maybe you can just close. Okay. Your red light was on. Okay. Thank you very much, Your Honor. May it please the Court. I am Pender Hare. Good morning, Your Honors. I am here on behalf of the North Carolina State Conference of the NAACP and other plaintiffs in that case, many of whom are here in the courtroom today. I will primarily address the Section 2 claims, but hope to comment briefly on the racial intent. And we do, the North Carolina NAACP is asserting both a constitutional and a Section 2 racial intent claim. Your comments will focus on Section 2 insofar as results? Yes. I plan to primarily focus on results. Your Honors, the plaintiffs, after being with you in 2014, went to trial, actually two trials. And in those trials, we applied the framework from the Jingles case and from this Court's League of Women Voters case in terms of how to prove a textbook Section 2 case. And Ms. Baldwin talked briefly about that. So I just want to summarize that. And then I want to talk about the errors that the District Court made that caused, as you asked, Your Honor, the inferences drawn by the District Court to be tainted by legal error. But per the League of Women Voters case, we proved three critical case sets of facts. One, African-Americans disproportionately use same-day registration out of precinct and the other eliminated practices and disproportionately do not have photo ID. And in the case of most of those practices, those disparities were proven to be statistically significant, which means they are not random, which means under all of race discrimination laws, statistical significance and disparity tells you you need to look further. It doesn't tell you you prevail, but it tells you you need to look further. And that's what the second and third prongs of the League of Women Voters test tell us. Could I stop you for just a minute? Sure. About the statistics. So do you believe that Section 2 results claim has a de minimis impact threshold? For example, if out of precinct voting only impacted 20 people, would it be a viable claim? I'm sorry, 20 people but racially disproportionate? This is your Section 2 results. Right. Right. It impacted 20 people. 20 people are affected and it's racially disproportionate. I think that you would meet that first, and I don't know with 20 people whether their statistical significance test would be possible, but you might reach the disproportionate, you might meet the disproportionate use prong, but you probably would not succeed on the rest of the test, particularly when you get to the state's justification for what it is doing. If it's eliminating a practice that only affects 20 people, I think that in the totality of the circumstances that claim might not succeed. So there is some bottom. I mean, I think you have to apply the totality of the circumstances in all situations, but as a voting rights lawyer looking at that, I would not expect a claim to succeed unless there were some unusual fact that I don't know about here. Wouldn't that answer be somewhat different if we were addressing the Section 2 intentional discrimination, which was just addressed as opposed to the Section 2 results? Yes. An intentional discrimination require-intentional discrimination, that's the end of it. The law is invalid and needs to be enjoined if it is tainted by, in part, by racial intent. Yes. So let me proceed to the second and third prongs, which is once you have disparate use, that is not all we proved, contrary to some of the claims from defendants. We also proved, as Ms. Baldwin said, a connection between the state's thwarted racial history and its current impacts or vestiges of racial discrimination that exists and impact of African American and Latino voters in the state today. And some of those connections are described on, I think, pages 12 to 14 of our reply brief. And as Ms. Baldwin-and in terms of the case-critical facts that the district court found, the district court did find that connection between the vestiges and the-and the eliminated practices. For example, the district court said it's easy to see a connection between certain reasons for ending up in the incomplete queue and literacy. And the district court then found that African Americans' vestige of discrimination is literacy and the benchmark electoral practice, which is same-day registration, produces virtually no incomplete registrations. That is the ameliorative interaction between-that the League of Women Voters test shows us is a classic case of Section 2 violation. Now, what caused the district court, once you get to those three critical facts and we proved eight of the Senate factors, what led the district court astray and not ruling in favor of plaintiffs? And the first thing that the district court did is it created a new causation requirement. It's not been required in any Section 2 case or any governing law. And that causation requirement, instead of looking at the connection between the vestige, the eliminated practice, and the-and, yes, the vestige and eliminated practice, the district court said you have to prove that the eliminated practices caused an increase in registration or turnout. That is not the causation requirement from League of Women Voters or any other precedent that's governing this case. And, for example, the district court said on page 347 of its opinion, plaintiffs fail to carry their burden of showing that same-day registration is responsible for the African American lead over all other races in registration. That is-and it said the same thing on page 355 about turnout. That is not a causation requirement in the case law. And that is the primary mistake that the district court made. And then it- I'm sorry. Tell me what it should have said instead. What the district court should have done, we established the three prongs of League of Women Voters, and then we proved eight of the Senate factors, and in those circumstances, the district court should have found- I understand the bottom line of what you want. Right. But, of course, if that was really so, you'd have moved for summary judgment. So, there were factual disputes, right? I think- I'm not really going to an easier question for you. Okay. Because I won't make you claim-explain to me why you didn't go for summary judgment if all the facts were in your favor. But what I would like to know is you were saying that he made this causation analysis, and what should the analysis have been instead is your question I'm asking you. Okay. I'm going to answer-I will answer that question. I will say briefly we didn't-at the beginning, there were facts and disputes. The district court found the critical facts in our favor. And that is-so, what the district court should have done, I mean, it is- This question- The analysis- That's my question relatively. I think it's a simple question. You were saying the district court applied what I think is described as a hyphen causation standard. What she is asking is what should he have applied? Right. And what- That's pretty straightforward. And I think that the confusion is he did both. He applied the correct standard, and he found all of the facts that lead to a Section 2 violation. And then he went-and that was enough. That plus incentive factors, that is the only causation requirement. So then he, instead of moving forward to the next step, which would have been find the violation, he veered off the road into a new causation requirement. So there was nothing more that the district court needed to do other than apply the League of Women Voters test, which he did and found those facts in our favor. And I think that the district court-the veering off the road really is exemplified by the district court's reliance on the 2014 turnout data to essentially trump the actual evidence that plaintiffs had of both burden and of a connection of the burden to the vestiges of discrimination. So let me ask you this question. If we-even under the rec test, as you indicate here, not the hyphen one, and the same question I asked the early attorney, what would be your best evidence to show this connection between this burden and the historical discrimination? And that evidence is set out on page 12 to 14 of our reply brief. And we presented evidence on each claim. So for same-day registration, we showed literacy disadvantages as well as transportation disadvantages all connected to that same-day registration help to ameliorate because you only have to go once to register and vote. And if you have any literacy issues, there are people there who will make sure that you don't leave something out, forget to check a box, and are not-your registration is not processed then. And we did that for each of the claims and different evidence to connect the eliminated practice to the vestige specific to that particular claim. I know I don't have much time left, so I'm going to make-I would like to make a couple of comments on intentional discrimination, if I may. And there, what I would say is- Section 2, intentional discrimination, or 14th Amendment? Both. It's the same. My comments go to both. And what I would say there is that plaintiffs-the evidence shows that plaintiffs proved the Arlington Heights factors, and it's set in a brief. We proved that all the changes made after the Shelby decision disfavored African Americans. And we also proved that virtually all of the reasons that the legislators stated at the time in the legislative record were simply not true. We proved pretext. And the legislators, in the face of that record, asserted legislative privilege, and never came forward and put their credibility under oath behind any other reason that they might say they did what they did in this bill. And therefore, we believe that there is only one conclusion that can be made on this record in terms of racial intent, and that is that all of the evidence supports and requires a finding that this law was enacted for racial intent. If that's true, doesn't the burden shift to the defendants in this case? Yes. Yes. They would then be able to try to prove that they would have done the same thing without the racial intent, but they never made any effort to do that. And they specifically said that the amendment to the photo ID law, they were not claiming that that cured any racial intent that existed in the original. Where did they say that? They said it's cited in our brief. They said it when we were introducing a piece of evidence that would have shown that the intent carried forward through the amendment. They said we're not making that claim, and in the evidence, we withdrew the evidence. So it's in the record. Before you sit down, so what is your view of the timeline for implementing or dismantling each one of these mechanisms? Ms. Riggs is a leading expert on that, but what we would say is that it starts in July. That's all right. She's going to talk about it. She can talk about whatever you want. Yes. Thank you. I just want to mention in my four seconds remaining that we also have a claim regarding Latino voters. And in addition, we made that claim through the same types of evidence. It's not highlighted as much in the brief, but the evidence is in a footnote. And the facts that the district courts said are missing with regard to African Americans exist in a huge way with regard to Latinos, which is that their registration and turnout in North Carolina is extensively lower than for either white or African Americans. Thank you. Thank you. May it please the Court. Alison Riggs for the plaintiffs. I'll be discussing the remaining constitutional claims, Anderson verdict, 14th Amendment claims, and 26th Amendment claims, and answer any questions you have about implementation. Maybe you can answer that question. Absolutely. There's ample time for this court to remedy the flaws in House Bill 589. Because of this court's stay, same-day registration and out of precinct are the law. They've been implemented in the last three elections. None of the infrastructure has been dismantled. So there's just no problem with same-day and out of precinct. With ID, early voting, and preregistration, there's still ample time to set up those systems, set up the systems for early voting, and to educate voters about these changes. Okay. I understand ample time, but I'm looking for a little bit more specific information about time. Certainly. We're now dealing with the day after the longest day of the year, but we're getting into shorter days. So right now, the county's early voting plans are due July 29th. That is not a hard and fast deadline by any stretch of the imagination. The State Board of Elections continues to review early voting plans through August and sometimes even into September, asking them to change their early voting plans if there are problems. Additionally, at least 70% of the counties use their early voting site, their County Board of Elections site, and in lieu of site, it's usually in the same building. So if we reimplement 17 days, not only do the counties have time to come up with an early voting plan that puts that into effect, but they're going to be using, for the most part, at least one of the same sites they already have in place. So it's just opening it up to voters for an extra seven days, although they really only have to do it in the weekdays. With photo ID, there is an opportunity to educate voters about the change that they will not be asked for photo ID. A voter guide goes out. It goes to the printer at the end of August. That's, again, not a hard and fast deadline, but that's a great opportunity for the state to educate voters that, just like the last three elections, same-day registration and out-of-precinct will be available to you. Here's the new early voting schedule, and, you know, you won't be asked to show a photo ID when you show up to vote. So these are some of the key deadlines, but they're flexible, and they get changed. So in 2012, the early voting demand was so great that the State Board of Elections, during early voting, ordered counties to provide extra time. So that these are the same amount of time as necessary either to affirm or to reverse the district court, as I'm sure you're telling us. Well, I think if you're going to reverse the district court on the early voting and photo ID, certainly the sooner you rule, the better. With respect to same-day registration and out-of-precinct, I think when you rule, it isn't relevant. The infrastructure is in place, and we're ready to go for the 2016 election. Those are your questions on implementation. I'd like to turn very briefly to the constitutional claims and note that under Anderson's verdict, the state is not free to just give and take away at whim mechanisms for participating in the political process. This is different from the 14th Amendment intentional discrimination claim. Right. This is a general claim you're making, Anderson-Burke claim. You don't need to show discrimination to get there, but we didn't address it in the previous preliminary injunction opinion, and the United States is not pursuing this claim. I'm just thinking in terms of the proof of it because essentially what you are dealing with is essentially non-affirmative-type measures, without the exception. And in that context, I don't know of many cases that have addressed it in this particular context. Courts in the Sixth Circuit have been pretty active in addressing Anderson verdict claims recently. Since 2012, two Sixth Circuit cases just within the last month, two district court cases that we cite, that reach both the Section 2 claims and the Anderson verdict claims. And, you know, it wasn't as important in the PI stage, but this is on the merits, and we do seek 3C relief. And the plain language of 3C says we can get bail in if there's a finding of a 14th Amendment violation. This is a 14th Amendment violation. And it is – we do believe it burdens voters. Do you get the same remedy if you get the 14th Amendment intentional discrimination as you would on this particular general? I think we can. The question is, does it justify equitable relief? And I think on the facts in this case, it does. But generally speaking, we say it's not just affecting – I guess my question is more, is the discrimination allegations here stronger than a general allegation on the 14th? On these facts, they're both very strong. It goes to sort of different remedies. I mean, the intentional discrimination facts here are just hard to dismiss. It doesn't mean the district court didn't try and do it, but they're really stunning. But here we also see that a decade's worth of voting law expansions created a situation where voters relied heavily on those expansions. And the court – and the state of North Carolina takes them away with no good excuse. And that doesn't comport with the state's obligation under the 14th Amendment. Very briefly, Your Honor, on the 26th Amendment claims, despite not having much time to discuss them here today, we don't waive them. And the evidence when viewed as a whole leaves no room for a conclusion other than this. Young voters were targeted for exclusion from the political process by a number of provisions that were applicable only to them. And they were targeted for exclusion because of the way they were voting and because of the power they were exercising. This isn't constitutionally permissible, and this court should reverse some of the 26th Amendment claims as well. Thank you. Thank you very much. Mr. Farr? Mr. Farr, before you begin, maybe you can tell me about what you regard as the timeline for implementing or dismantling each of these. Judge Motz, fortunately for me, Mr. Peters is going to address that question. Okay, but I want to be sure he does. He's going to. He doesn't say now Mr. Farr is going to do this. No, no, we spent a lot of time on this. Mr. Peters has represented the Board of Elections for a long time. I think he's got very good information for the court. Your Honors, my name is Tom Farr. I'm here representing the defendants with me today is my partner, Greg Getty, Phil Strack. Butch Bowers is representing the governor, and Alec Peters is here representing the State Board of Elections. I think the most important point I can make, Your Honor, is that we disagree with the plaintiff's position that Judge Schroeder did not apply the test that this court articulated in its preliminary injunction hearing. We believe he religiously applied that test, and then he made extensive findings of fact and concluded that based upon these extensive findings of fact, the plaintiffs had not carried their burden approving either of the prongs of the Section 2 test that this court laid out. Well, you know, at least with regard to my understanding, it's helpful, Mr. Farr, to be able to specifically indicate the claim that you're talking about. Are you talking about Section 2 results, Section 2 intentional discrimination, 14th Amendment intentional discrimination, or the general claim? And, I mean, I get your point in terms of the overall view of it. Yes, sir. There's clearly a wrongness in the noble review, but in terms of the analysis that we take here and what's been presented on the other side, it's helpful, at least from my perspective, to get your position on those. Yes, sir, Your Honor. I'm talking about the Section 2 claim at this point of my presentation. And you're talking Section 2 results? Results. You know, I may be missing something, but I also agree that the intent analysis under Section 2 and the 14th Amendment is the same. And if I get to that, I'll talk about it, but I think if you'd read our brief, there really is no case that has been issued by any court with facts similar to what we have that were found by Judge Schroeder, where a jurisdiction has been found guilty of intentional discrimination. The court found that the legislature followed its procedures. The court found that the legislature accepted amendments, a fairly significant one, related to establishing a benchmark for the number of hours that could be used for early voting. The court found that the General Assembly adopted a two-year rollout period for the photo ID requirement that had been recommended by the commission that President Carter had proposed. The court found that the General Assembly mandated a very extensive educational campaign and other findings related to the intent arguments, whether under the 14th Amendment or Section 2. Compare this case to the V.C. case, where I do not think the facts were as favorable to the state as they are here in the North Carolina case. For example, the Texas statute charged a fee for the photo ID when it was first enacted. Despite having a less favorable record for the state, even the V.C. panel, which found that the Texas ID was illegal, overruled the lower court's findings that Texas had been guilty of intentional discrimination. Here, we have a more favorable record for the state, and we have factual findings, detailed factual findings by the district court that intentional discrimination did not take place. So, whether that's viewed under the 14th Amendment or Section 2, Your Honor, I think it's clear that Judge Trover's findings on intentional discrimination are not clearly erroneous. Well, even with the distinction of Section 2, and I get your point, I agree. I think the similarity between Section 2 in terms of intentional discrimination and 14 is similar there. It was the differentiation of Section 2 as a result. In terms of intentional discrimination, there are some facts here that bear at least some comment in terms of the timing of the enactment of the expanded bill on the same day that the Shelby case came down. In terms of some of the comments previous to that, in terms of evidence that was presented, in terms of why this was presented for purposes of intentional discrimination, would you address those? Well, again, Your Honor, my first reaction is the district court reviewed and analyzed those facts and did not find them persuasive as a matter of factual findings on the issue of intentional discrimination. I think the court may be referring to the statement by one legislator, no doubt a significant one, Senator Apodaca, where he made the comment about now we can go forward with a full bill. I would just refer you first to the VC court where they go into detail saying relying upon the statement of one senator to find intentional discrimination by an entire General Assembly is a very slim read to rest your finding on. However, Your Honor, if Senator Apodaca had good counsel, why wouldn't it be prudent to wait to see what the Supreme Court was going to do with the Shelby County case before you decided how you would move forward with legislation? One thing I'd point out is almost all of the provisions that have been challenged in this case have been filed previously. It wasn't like they just dreamed them up after Shelby County was issued. Let me ask you a question because this is where it gets a little muddled. If you're dealing with a racial gerrymandering case, certainly politics can be the basis for you moving forward on it. In an intentional discrimination case, do you maintain that an entity or state can use race as a basis for effectuating a partisan goal? That is to increase the party representation of one or the other and race being the basis of it, knowing that a particular minority group votes a certain way, the efforts to suppress that vote results in a partisan advantage. If the partisan advantage is the basis for them doing it, not the race, is that legitimate? Your Honor, it may be, but we haven't made that argument. The cases you're referring to, and you and I have had this discussion recently in the districting case with the Cromerty case where the court found that the district was not racially gerrymandered. That's why I brought up the racial gerrymandering so we could differentiate. We're not talking about racial gerrymandering. We're talking about an intentional discrimination claim. My question goes to whether you made the argument or not, but I think something's there. At least I feel something's there, that the question comes up, at least from the plaintiff's perspective, that race was used here as a basis for suppressing a minority vote that you knew would vote heavily in a particular democratic instance, in this instance. I'm only asking, is that a legitimate basis on an analysis of intentional discrimination under the 14th Amendment or Section 2? Yes, Your Honor. My answer to that question is it may be, but we didn't make that argument.  However, Your Honor, I want to point out that in this case, the plaintiffs have quoted the Lulac decision, and the quote in Lulac where I think it's Justice Kennedy said there was a troubling mix between race and politics. Lulac was a vote deletion case, so that opinion was made in the context. I still want to deal with that. I want to make sure I got my question. You didn't make the argument. I'm not saying you made the argument. I'm saying if the plaintiff makes an allegation that race was used in this instance as a basis to effectuate a partisan goal, is that – what is your argument to that? What is your statement to that? Not that you made that argument because this is not your case. You're a defendant. I'm asking, what is your reaction to that? My reaction is, Your Honor, is the evidence does not show that that happened, and the district court found that that did not happen. There's a more compelling language in Lulac than what you just quoted. It was something like this, undermining the progress of a racial group that has been subject to significant voting-related discrimination, and that was becoming increasingly politically active and cohesive. There's a mark of intentional discrimination. Yes, Your Honor, I'm aware of that language, but also that language was brought up in the context of a vote deletion claim where there was proof of injury to the plaintiffs because the plaintiffs had met the Jingles preconditions. They had shown that they were a compact minority population sufficient to be a majority in a single-member district and that they could not elect candidates of choice without – because of racially polarized voting. That language you just quoted would not have been relevant if they had not established that they had been injured by the districting plan because of the Jingles preconditions. So, that's where that comment came from, and it must be viewed in context. What – I mean, what's the – what is the point you're making regarding vote deletion? I'm just trying to understand it because I know you do this all the time, and you can help me with it, but as I understand, vote deletion is still under Section 2. Yes, but it goes to whether there's been an injury, Your Honor. I mean, it's the same statutory provision. But for – in the Lulock case where those statements were made, the plaintiffs had shown that they'd been injured. Here, there is no showing of injury. This goes back to the Section 2 results test that this court adopted where the first prong you directed that Judge Schroeder had to decide whether the law imposes a discriminatory burden, meaning members of the protected class have less opportunity than members – other members to participate in the political process and elect candidates of their choice. So, if you read the briefs that the other side has filed, they drop from their citation of your test the phrase, less opportunity than other members to participate in the political process. So, that was the key inquiry. You don't get to the jingles factors, as we call them, or the societal conditions that are part of your second test until the plaintiff proves the first part of your test, which is that the challenged election practice imposes a burden that results in less opportunity for members of the protected class. And Judge Schroeder religiously applied that test and made detailed findings that plaintiffs had failed to carry their burden in that respect. So, in a Section 2 results test, which is what you're talking about here, right? Yes, ma'am. Your submission is that you have to demonstrate more burden than you would in a Section 2 intent case, for example. A great constitutional case because tied into – you don't have that direct evidence and you need this indirect evidence. Isn't that your submission? No, Your Honor. First of all, I strongly deny that the General Assembly engaged in intentional discrimination. I understand that. But even in an intentional discrimination case, we believe you have to prove injury. But you have to prove that the injury element is stronger when you have a results test, when you're trying to prove a results test. It has to be stronger. Or maybe you don't think it does. But I would have thought that that was part and parcel of what you were saying. In other words, you're saying you can't have a results test here, and you were talking about the injury, and that the injury that you have to show in a results test has to be stronger because you can't point to this in the results test evidence of intentional discrimination. Your Honor, I have to apologize in answering this question because there is not a lot of guidance by the Supreme Court on these vote denial cases. Believe me, we are aware of that. So what we can only do is we can look at the vote dilution cases and see what sort of clues we can discern from vote dilution cases. We know that in a constitutional vote dilution case, you still have to prove discriminatory results if you go back to the city of Mobile case, but you also have to prove purposeful discrimination. Right. So I would say... I was just trying to line up because if it was exactly the same, you would never have, you would never, there wouldn't be any difference to them. No, I think the difference, Your Honor, is that for the 14th Amendment or the Section 2 intentional discrimination claim, you have to prove purposeful discrimination plus the injury. For the Section 2 results claim, you just have to prove the results. Why would you ever go to an intentional discrimination claim then? There would be no choice. You would always go to the results claim. Not if you wanted to take the unprecedented step that really has only happened once in the history of the country to put North Carolina back under the effective preclearance requirement that the plaintiffs are seeking in this case. They don't get that simply by proving their Section 2 results claim. They've got to prove an intentional discrimination claim to put North Carolina back under the supervision of the district court where they would effectively be in a preclearance situation again. That's the reason why the claim's been brought. Well, I understand why you think they brought it, but what I'm trying to do is to think why Congress would enact it. And I don't think they would have enacted a statute in which there were exactly the same elements except you had to prove an extra thing with one. I mean, it just doesn't make any sense. So that's why I was trying to, in other words, I was trying to sort of figure out the difference. Again, Your Honor, I apologize if I'm not clarifying this as well as perhaps I might, but I would just say that in an intentional discrimination case, you've got to prove purposeful discrimination plus injury. Right. Okay. But all I was saying is you have to show more injury or more impact if you're doing a Section 2, the other Section 2 claim. I would have thought that would be your argument. Your Honor, that sounds plausible to me. I need better than plausible. Well, then I will defer to the Court's interpretation on that issue. I want to make sure I understand what's going on here. Because I understand what you're saying is that intentional discrimination is the injury. That's the additional part to it. In addition to purposeful discrimination, injury. Judge Monson's alluding to even with results, you have to show injury. So the question that she's posing is what's the difference if you don't have two different claims? Well, Judge Wynne, I'm sorry. The only thing I can say is that if you prove purposeful discrimination, that puts you in line to get this other remedy where the state is now under the equivalent of a preclearance obligation through a district court. That's the benefit to the plaintiffs of proving purposeful discrimination. And I would say there's precious few cases where purposeful discrimination has been found by a district court in these types of cases, much less where the district court has found there was not purposeful discrimination relying upon extensive factual findings, and then the case was then reversed by the appellate court. Intentional discrimination is the quintessential issue of fact. And that relies upon the credibility of the witnesses and analyzing all this. I agree with you on all that. Judge Monson, I apologize if I'm not answering your question. On this record, you've got evidence that there was a surge in African American registration 10 years prior. And the laws changed, and they claim that you're adversely affecting them, which would be the motive to protect your own political interest. Means in this case could be that the Republican Party got control of both the House and Senate and the governorship, and the opportunity came to change those pretty liberal voter registration provisions with Shelby. It happened the same day Shelby was decided. It looks pretty bad to me in terms of purposeful discrimination. Well, Your Honor, I hope that I can persuade you that it was not a nefarious thing. Certainly, Judge Schroeder found that it wasn't. And there's a couple of premises in your question that I have to challenge. So there's a correlation between same-day registration and 17 days of early voting and out-of-precinct voting and pre-registration and an increase in the black participation rate and registration rate during the 2008 and 2012 election. Now, this was – I've never been in a trial where there are more experts, and they came from MIT and Harvard and every university in the country. And all these fellows had done what's called a cross-state analysis, where they give opinions on whether election practices are the cause of an increase in turnout or registration. None of them – and they've all done them. At the plenary injunction stage, none of them had done a cross-state analysis to try to opine on whether these practices had caused an increase in turnout or registration. And they were all put on notice that there's evidence found by Judge Schroeder that there's states like North Carolina, such as Virginia, where the black turnout and registration rates went up at equivalent rates, and Virginia did not have same-day registration and out-of-precinct voting and 17 days of early voting. So it was our contention at the preliminary injunction stage that they had failed to prove any sort of causal link between these repeal practices and the increase in participation by African Americans. So then we went to trial, and we had the benefit of the 2014 election. And the plaintiffs had said, well, you can't just rely on one election. Well, it's the only election we have to rely upon. And after we had the 2014 election – Is it something you can rely upon on the intentional discrimination? I understand this gets intertwined when we're talking results on the Section 2 Intentional Discrimination, but we're kind of going back and forth. And I think the question, too, going back to Judge Floyd's initial question, some facts were given, but really the legal issue deals with the application of the Arlington Heights standard. And the question being whether the district court applied the actual motive standard on Arlington Heights, or did he apply, the plaintiffs say incorrectly, a rational basis review. What are your comments on that? Well, Your Honor, if you read his opinion, he went down all the Arlington Heights factors, and he made factual findings that he relied upon to conclude that there was no purposeful discrimination. Did he employ the actual motive standard on Arlington Heights? Well, Your Honor, I'm not sure what you mean by motive standard. Did he apply the rational basis review? No, I think, Your Honor – Then tell me the standard he applied. On the intentional discrimination claim, he followed Arlington Heights. And what is that standard? Well, he looked at did they follow their normal procedures, which they did, despite all the arguments that had been made that they did not violate any of their rules. They handled this bill in a very similar way to other bills. They adopted amendments that softened the alleged impact on the protected group. They adopted a very significant amendment when proposed by a Democratic senator, Senator Stein, where he – the original bill dropped the number of days from 17 to 10. They dropped the number of days from 17 to 10 because, as Judge Schroeder found, under the prior law, there had been gamesmanship about the location of the early voting sites. They were placed in areas that favored Democratic voters, and Judge Schroeder made a factual finding on that. So the reason why the legislature cut the days was they – Isn't that closer to a rational basis type review as opposed to an actual motive review on engaging in an actual motive under the Arlington Heights Act? Your Honor, I honestly think that, with due respect, I think the rational basis issue is a completely different question than whether – That's what I mean. I need you to articulate that. I'm not trying to make the case one way or the other on it, but that, I think, is critical. And the critical determination is what did the trial judge do in applying the law? And our review there is not clear error. It's the no vote. And if he didn't apply the law correctly, then we have a problem, a problem outside of whether the facts are there with clear error. And so my question to you is address the standard of review that the trial judge applied here because it does seem to me that it's more in the rational basis review venue. And if it was, what does it tell me? Applying the rational basis review, would that have been, or was it, correct? Your Honor, I think it's a different question. The question is – No, let me ask that question. Maybe I'm not asking my question. My question is, would it have been appropriate, and assuming that the plaintiffs seem to say it did, for the trial court to apply a rational basis review? It would have been proper for him to look at issues like that when he got to the Arlington Heights factor about tenuousness of the policy behind the statute. That's about fifth on the list, okay? It would have been proper for him to apply a rational basis review when looking at the Alton Heights factor with regard to tenuousness? It would have been proper. Now, rational basis goes to when you're analyzing a statute that does not impact a suspect class, okay? Under Arlington Heights, the issue is, were there rational reasons for the legislature's decision? And in Factor, Your Honor, they did articulate rational reasons for their decision in the legislative history. For example, for early voting. I've already talked about that. They decided that they were unhappy with the gainsmanship that was being done by less than majority votes by the County Board of Elections and the State Board of Elections as far as the location of early voting sites. So they decided they wanted to have all sites in a single county treated the same way. And they wanted the days reduced to reduce the potential for gainsmanship. Then Senator Stein offered an amendment suggesting that despite the reduction of days for early voting, that each county be required to keep the same number of hours that they had used in the most analogous recent election. So, for example, in 2014, they had to use at least the same hours that the county had used in 2010. 2012, they have to use the same number of hours that they used in 2016. This required and will require that the county boards open up more sites, extend the evening hours, extend weekend hours, and... But there's some sort of waiver provision in there. There is, Your Honor, but unlike the prior system, where whoever was in the majority on the county boards could dictate what the plans would be, under the new system, under HB 589, it requires a majority vote or a unanimous vote. So, in other words, North Carolina now has got two Republicans and one Democrat on the County Board of Elections. They've got three Republican appointees and two Democrats on the State Board of Elections. County boards cannot reduce the number of hours unless all three of the county board members agree and all five of the state board members agree. There's a county board for each county? Yes, ma'am. And there are 100 counties? Yes, ma'am. And they're all aligned that way? Yes, ma'am. And so... I'm sorry, two Republicans, one Democrat? Which is it? The governor decides who's in the majority, Your Honor. So it's two Republicans and one Democrat, yeah. Right. Well, but for the benefit of the public here, when there was a Democratic governor, that governor decided who was in the majority. Right. It's not atypical. Maryland does this kind of similar. Right, right. Yeah. Why did this statute, as it's passed, specifically exclude public assistance, assistant ID? Your Honor, I can't really answer that question. I don't know why they did that. I don't know... I'm getting more back to the intentional discrimination aspect of it. We know that those are typically used more by minorities than others. And the question I'm asking is, if you don't know, you just don't know. But, I mean, because Jeff Schroeder didn't give an answer either to it. And I thought maybe you might give me one today as to why he would exclude public assistance ID of the legislature from... Well, first of all, Your Honor, I have to confess, I don't know if that was ever suggested by anybody. It may have been, but I don't know. Suggested that it was excluded? I mean, it's clearly excluded. Well, I know, but I don't know if anyone proposed that they be included. They may have, and I'm sure if they did, the Plaintiffs' Council will say so when they get up on rebuttal. I thought they were excluded. I thought they were specifically excluded. Yes, Your Honor, but I don't know if it came up. I don't know if there was a vote to, you know, let's amend the statute to allow public assistance ID. I don't want to be argumentative. It seems like the question is not, why didn't someone ask you to put it back in? The question is, why did you take it out? Because you're the one that's being said to have intentionally discriminated. That's my question. Why did they take it out? Because it was reasonable for them to give most of the responsibility for the creation of the IDs to the Division of Motor Vehicles, which had these offices all over the state where people could go get an ID. And we've heard all this bashing of the Division of Motor Vehicles throughout this case. Let me ask you another question. I want to deal with the Division of Motor Vehicles, too, if you want to get that comment. But in enacting this statute, did the legislature specifically request certain racial demographic data? Yes, Your Honor, and let me ask you a question. Why did they do so? Well, let me ask you a question, Your Honor. No, you don't ask me questions, Justice Barber. I understand. You and I have been together a lot, and I understand where we're going. All right, well, I'll stay. Let's keep it to where we are. I'm simply asking a question, and either the answer is one way or the other, and I'll leave with whatever you give me. My question is simply, we know that racial data information was requested. That's part of it. The contention on the other side of it is you did so, this legislature did so, with a knowing mind of how it would affect minority voters. I simply ask you to respond to that. Well, Your Honor, I would say that it was not prudent not to ask for that data, knowing that these laws could be subject at the time when that data was asked. The state was still under Section 5, but even after Section 5 went away, it was still under Section 2. So it would only be prudent for a legislature to ask for that information. In fact, Judge Schroeder asked the Justice Department at one of our hearings, would it have been worse or better for the state of North Carolina not to ask for that data, and the Justice Department basically said, we can't answer that question. We don't know what the answer to that question is. So if you're concerned about complying with laws, and where we have laws that prohibit discrimination against minorities, it's prudent to find out to some degree what the racial demographics are. And if that demographic information, the point being, you may have had a legitimate reason for asking for it, but once you have it, you have information, and that information informs you of certain patterns of behavior. That is, that early voting is more likely to be used by Americans in the first week, for example, or voter IDs are more likely not to be possessed by them, or that out-of-precinct voting may be more likely to be used because of lack of transportation and because of being poor and because of health concerns. Is that the type of information, my question is, that the legislature had before it enacted the bill? May I answer the question, Your Honor? Please, look at me and please. Yes, sir, Your Honor. Your Honor, first of all, every case, whether it's intentional discrimination or Section 2 or Section 5, every court has said evidence of a usage or a disparity does not prove anything. So that's the first point. Secondly, there's no evidence, Your Honor, that… Is one of those every courts in the United States Supreme Court? What's that? Is one of those every courts in the United States Supreme Court? Absolutely. You can't, you don't prove a violation just because there's disparate usage of a practice or because there's an alleged disparate result. In fact, you know… I'm really trying to get at least my understanding clear on it. I asked a specific question as to the type of evidence that was before the legislature, before it enacted, whether it informs a decision or not. I don't know. It could go either way. But I just want to know, at the time that it enacted this, did it have this information that I just sort of picked off by example, information that the use of these particular procedures was disproportionately higher in a minority community than they were in non-minority communities? Your Honor, they had knowledge that State Board of Elections report indicated that they were unable to match African Americans at the same rate as whites. It was no indication that they didn't possess photo ID, but just that they could not match them. The State Board of Elections said that their report was inflated because there were all sorts of problems associated with matching reports. And, in fact, Your Honor, the evidence shows that it was inflated. And the state took that information and they adopted a two-year rollout period before they decided to enforce photo ID, and they mandated what's an unprecedented, as found by Judge Schroeder, educational campaign to try to educate people on photo ID and to help them get a photo ID. So they got the information and they took appropriate steps to try to do something about it. Thank you. Thank you. Thank you, Your Honor, and may it please the Court, I'm Alexander Peters of the North Carolina Attorney General's Office, and the only thing I'm going to talk about is the timeline. Okay. And I think it might be simpler conceptually, but I want to make sure the Court is aware of its practical considerations. The general election is 20 weeks from today, and so I want to make sure the Court's aware of what's going to happen in those 20 weeks. And I think it might be simplest if I take it by each of the mechanisms we're talking about, the pre-registration, SDR, out-of-precinct provisional voting, photo ID, and early voting. What counsel for plaintiffs said was partially right but partially incorrect. Plaintiffs don't administer elections, and so it would be understandable that perhaps they don't have quite the information. When it comes to pre-registration, same-day registration, out-of-precinct provisional balloting, and photo ID, all of those things are handled in the SEEMS system, which is the State Election Information Management System suite of applications. There's testimony about that in the record below. SEEMS has to be in place in the form it is going to be used prior to the beginning of absentee voting at the beginning of September. So SEEMS pretty much has to be locked in for what it's going to look like during the election by mid to late August. Before it can be locked in, a number of tests and essentially mock elections and that sort of thing have to be run to make sure everything is working together properly and that it's going to do what it's supposed to do on election day. Those tests have already started. So we are really at the point at this point that it's very difficult, if not impossible, to start recoding new information into SEEMS and for it to work for the general election. There's no way that we can issue an opinion that does anything, is that right? No, that's not what I'm saying. Okay. I'm saying, no, that's not what I'm saying at all, with one exception, and that's pre-registration. It is too late at this point, and especially since that has to be coordinated with DMV's database, it's too late to have SEEMS set up to deal with pre-registration and have it in place prior to the beginning of September, which is when it would need to be in place. For the purposes of this election, that doesn't have the effect it might seem because anyone who will be 18 on November 8th can register now. So the fact that there is not pre-registration built into the system at this point would not prevent anyone who will be 18 at the time of election to register, if they haven't already, because they may have registered to vote in the primaries. Is that because I'm thinking pre-registration is something you have to do in addition to what you already have. The others seem to be you're taking away from things that are there, so it may be easier to subtract than to add. Same-day registration, out-of-precinct provisional voting, because of the preliminary injunction in the trial court and because of this court's order, that those were to stay in place pending a decision of this court. Same-day registration and out-of-precinct provisional voting are already in SEEMS. SEEMS is set up to handle them and can handle them and will handle them. Same with photo ID. It is set up to handle that. The ideal would be, if we were not going to have any of those things, would be to pull them out of the system, but you can't do that without risking messing up other things you don't intend to mess up. So what the State Board would have to do if the court were to issue a decision that either said no same-day registration in November, no out-of-precinct provisional voting in November, and or no photo ID in December, the State Board would simply have to make sure county boards know not to use any of those. That leads to what the second issue is with regard to this, and that's training and education. Statewide mandatory training for county boards of elections. County board members and state and county elections officials are expected to attend this training, and it's the training that they use to train poll workers in the counties. That training is set and has been set for months for August 8th and 9th, which is seven weeks from yesterday, seven weeks from today. So that's when county elections officials are going to be trained on what the rules are for the election and given the materials to take back to their counties and use for training. If any changes are made after that date, then it becomes an issue not just of educating people what the rules are, but re-educating people it's not what you've already been told. It's now going to be this. And it also means redoing the testimony and evidence in the trial court about what's called the station guide. That's the big resource manual, essentially, that every poll worker has at their station that has all the information about how to do everything. That would have to be redone in order for accurate information to be available to county poll workers. What does this information now say? At the moment, some of these provisions are in joint, so what is the information now? Currently, what the station guide does is tell them how to implement photo ID, how to do same-day registration, and how to do out-of-precinct voting because those things are all in place for this election as it stands now. So if we should conclude, we should affirm the district court, it seems to me it would be pretty easy to just strike those. I mean, I used to represent election boards in my youth. It might be easier for same-day registration and out-of-precinct provisional voting. For photo ID, it becomes much harder because it is interwoven into so many aspects of the guide in terms of the process coming in. I would also point out that videos and the like have been prepared that were used for the primary and that would be used for training in this go-around. All those deal with photo ID on how to implement photo ID. The bottom line is if there are going to be changes, if we want to make sure the election is administered uniformly and that county elections officials have the best information available to them, really the state board of elections would need to know what changes need to be made well in advance, weeks or a month in advance of the training, so that they could make sure that all the training materials are accurate. Council also mentioned the voter guide that goes out to every household in North Carolina. Four and a half million go out. Under the contract with the vendor who is printing that voter guide for the state board of elections, the proofs have to be at the vendor, at the printer on August 5th. So again, we're talking an early August date by which things are going to be going into print and being educated, county board officials will be educated in terms of what the rules are for the elections. If we get after that point, it becomes an issue of re-education rather than simply saying these are the rules. With regard to early voting, I think it's important to remember that it's the counties that implement that. And it is true county boards of elections have the ability to tell other public buildings in the county, we intend to use that building on these days for early voting. There's a 90-day deadline for that. If they want to use them for the full early voting period, if it were increased to 17 days, they would need to give that notice by July 22nd in order to be entitled under the statute to use it. A bigger issue for counties might be poll workers because they're going to be working with budgets that for all the counties are July to June budgets. And so the budgets are set now or are in the process of being set over the next week or so. And so if we got into an instance where they might need to expand the early voting time, they might not have the budget to be able to pay the people to handle it. The reality, though, as Council alluded to... I thought there was a same-hours provision. I'm sorry? I thought there was a same-hours provision. There is the same-hours provision. Why would there be an increase then? It would depend on whether they were able to spread things out more or whether they were adding more time to what they've already planned for. But it is, I think, important to remember, as Council alluded to, that under the old statute, the only requirement for the 17 days of early voting was that the County Board of Elections offer early voting during business hours and on the last Saturday. So it is possible that were a county told they have to add seven days to the period, they might deal with that simply by offering early voting at the County Board of Elections office and not doing anything else, which would be consistent with the old statute. If you have other questions, I'll try to answer them. I must say, Mr. Peters, I'd hate to see you leave the Department of Justice there because I'm not sure anybody knows this as well as you do. Unless you know something, I don't. I don't have any plans to leave. Thank you very much. Ms. Grigg, you have some more problems? In fact, I do, Your Honor. I want to reply to some of Mr. Farr's substantive points and then some of Mr. Peters' implementation points. But the substantive points, I think, are a little more central. Mr. Farr mentioned there's no case with facts like this where a state has been found to be intentionally discriminatory. Your Honors, there is no case like this. There is no precedent for the rollback that House Bill 589 created impairing voting rights across the state. House Bill 589 represented the first major constriction of access to the polls in North Carolina since 1965. And North Carolina picked up where history left off in 1965 right after Shelby County came down. The district court's legal errors were numerous. So to your point, Judge Wynn, it does matter. The distinction between is the court looking at actual motive versus rational basis is an important legal distinction. Arlington Heights... What was used here? It was rational basis. The district court said... How do you know that? Because I didn't get that answer very clear from Mr. Farr. So how do you know it was used here? The exact language of the district court. The district court said it would not have been unreasonable for the North Carolina Senate to have waited to see how Shelby County came down. That's not actual evidence. That's the district court coming up with a rational basis. But an important point here is the Senate wasn't just sitting on a voter ID bill waiting to see if it could avoid the administrative burden of going through preclearance. It lumped together all of these other changes. It dramatically expanded the scope of the bill. Contrary to what Mr. Farr said, these weren't all bills that were just percolating somewhere else. The previous version of House Bill 589 that came out of the House did include public assistance IDs. Post-Shelby, they take that out for no reason, and the district court recognizes in his own words, the district court... He says they could have surmised it would have affected them. Right, absolutely. So these are not actual reasons. These are rational basis reasons. And if you don't look for pretext and if you don't look for actual motive, you collapse it into rational basis, you commit legal error, and you reach the wrong conclusion. Mr. Farr also implied that the language that we've cited from LULAC about the troubling interplay between race and politics, and to get to your question, Judge Floyd, where you're acting to stop or stymie an emerging political power somehow only applies to a vote dilution case. That's not true. The U.S. Supreme Court in Carrington v. Rash used the same language. It's intentional discrimination, violating the 14th Amendment, to fence out a portion of the electorate because of how they vote. And so it is not constitutional, and it's not limited to just a vote dilution case. Mr. Farr also mentioned somewhat incredibly that there is no showing of injury here. So now I'm pivoting to the results issue. There's no evidence of injury. Respectfully, that's not what the record shows, and it's not what the district court found. The district court found, talked about the hundreds of voters that we presented who were actually disenfranchised in 2014 because of House Bill 589, because of the cut to same-day registration, because of the cut to out-of-precinct voting. And it's there. It's throughout the opinion. Judge Wynn, on your question about pre-enactment knowledge, I just want to make clear that the record does show, and we've cited in our brief, that on all different levels, the legislature asked for data on racial impact during the post-Shelby consideration of House Bill 589, and it got that data. So that's on page 26 of... Your point there, that data couldn't have been requested for preclearance? Post-Shelby. Post-Shelby. Yeah. I mean, that is a relevant point, but it also goes to the knowledge with which the legislature was acting. Well, are you making an argument that the legislature couldn't have requested them the information? No. Legally? No, no. I thought that that's what you said. No, no. Post-Shelby, though, they were relieved of the duty to comply with Section 5. But more importantly, this goes to they knew the disparate impact of every one of these provisions. The decision to include... that get filed every year, the ones that got folded into House Bill 589 post-Shelby were the ones with the disparate impact on racial minority voters. And so on the... So were there separate bills dealing with all of these provisions, the OOP, all of them in the hopper, but just not combined in one piece of legislation? I'm not actually aware... Would you like to show that? I'm actually not aware that there was an out-of-precinct bill. There was a bill proposing to eliminate same-day registration, and I could just be wrong on that. There were bills wanting to eliminate preregistration. There were bills wanting to cut early voting. And where were they? How far had they advanced? None had been heard. They had been filed. None had had... At your house. Right. Exactly. And that is all in the JA. There's an extensive amount of legislative history material in the JA tracking other bills. It's an extensive JA. It is an extensive JA. One other error, I've been jumping around a little bit, but I do want to emphasize that this court in 2014 emphasized that the district court committed legal error by dismissing as minimal the number of voters disenfranchised by certain provisions. And this court said the basic truth is that even one disenfranchised voter, let alone thousands, is too many. And the record in front of the district court, the unrebutted record, the facts that he actually found, demonstrated that there were thousands of voters disenfranchised. And so sacrificing voter enfranchisement at the altar of bureaucratic inefficiency or under-resourcing isn't acceptable. And this goes to the remedy that Mr. Peters was just talking about, which is, you know, the State Board of Elections may have set a training for August 8th or 9th. To enfranchise voters, that training can be moved. They may have a contract to get proofs for a guide. If a federal court rules that these laws are racially discriminatory and unconstitutional, I think this court's ruling trumps that. There's ample time to educate the voters, get a remedy in place, and make sure that North Carolinians can vote in November. Thank you, Your Honor. Thank you very much. We will take the case under advisement, and we will ask our clerk to adjourn court, and then we'll come down and greet all the lawyers. This honorable court stands adjourned, sign and die. Godspeed to the United States and this honorable court.
judges: Diana Gribbon Motz, James A. Wynn Jr., Henry F. Floyd